Filed 7/8/16  In reL.B. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re L.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065322 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J256007 & J256190 & J256191) |
| v. | OPINION |
| M.J. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin and Cheryl C. Kersey, Judges.  Affirmed in part; reversed in part with directions.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant M.J.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant J.B.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

M.J. (mother) is the biological mother of L.B. (a girl, born July 2014), M.L. (a girl, born June 2013), and Ju.B. (a boy, born January 2012) (collectively, the children). J.B. (father) is the presumed father. Both mother and father (collectively, parents) appeal from the juvenile court's order terminating their parental rights under Welfare and Institutions Code[1] section 366.26. Mother does not challenge the substantive findings made by the juvenile court, but contends that the court's orders must be reversed because plaintiff and respondent San Bernardino County Department of Children and Family Services (the Department) failed to comply with the notice requirement of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). Father contends that the court erred in terminating his parental rights because he had a beneficial relationship with the children under section 366.26, subdivision (c)(1)(B)(i). We agree with mother that the Department failed to comply with ICWA, and remand the matter with directions to the juvenile court to ensure the Department's compliance with ICWA's notice requirement. We affirm the orders of the juvenile court in all other respects.

## FACTUAL AND PROCEDURAL HISTORY

A.    BENEFICIAL RELATIONSHIP BACKGROUND

Mother has general neglect referrals dating back to 2008. In July 2013, the Department investigated a referral. Mother and her six children were living in a filthy

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

house.  She was not paying rent and the children lacked sufficient food.  By September 18, 2013, the Department substantiated mother's neglect.  The four older children were placed with a non-offending father.  Mother engaged in a voluntary family maintenance plan for M.L. and J.B., addressing her mental health issues and daily use of marijuana and alcohol.  The siblings had features suggestive of fetal alcohol syndrome.  Father resided out of state and was uninvolved in the parenting.  Mother's family maintenance plan was terminated in November 2013 when her whereabouts became unknown.

On July 29, 2014, the Department received a referral indicating mother's severe neglect of L.B., who was born at 31 weeks of gestation and tested positive for methamphetamine and opiates.  Mother had a history of drug and alcohol use while pregnant, and six other children were removed by the Department.  Father had not visited L.B.  A relative reported that parents were looking for a place to live.  On August 14, 2014, the Department detained L.B. out of parental custody in a local hospital.  M.L. and J.B. were then ages one and two and one-half, respectively; their whereabouts were unknown.

On August 18, 2014, the Department filed a section 300 petition for L.B.  The petition addressed mother's mental health issues and parental substance abuse, and father's failure to protect L.B. (§ 300, subd. (b)); and indicated that parents' whereabouts were unknown at the time (§300, subd. (g)).

On August 19, 2014, at the detention hearing for L.B., parents were present when the court detained L.B. and set a jurisdictional and dispositional hearing for September 9, 2014.

In August of 2014, parents separated after engaging in domestic violence with each other. The Department located mother with M.L. and J.B., and detained M.L. and J.B. in foster care that month. An aunt indicated that she took care of M.L. and J.B. because mother was irresponsible. M.L.'s immunizations were out of date, and she suffered a burn on her arm that was not properly treated.

On September 2, 2014, the Department filed section 300 petitions for M.L. and J.B. The petitions addressed mother's mental health issues, parental substance abuse, and domestic violence. (§300, subd. (b).) On September 3, 2014, at the detention hearing for the two children, the court detained M.L. and J.B. in foster care and set a jurisdictional and dispositional hearing for September 24, 2014. Eventually, the court scheduled a mediation to address jurisdictional and dispositional issues, and consolidated M.L.'s and J.B.'s cases with L.B.'s case.

The Department recommended that the court sustain the section 300 petitions, remove the children from parental custody, and offer family reunification services to mother and the presumed father of the children. Mother abused substances and received a psychotropic medication prescription at a crisis clinic. M.J. was born positive for marijuana. In utero, L.B. was exposed to methamphetamine, alcohol, marijuana, nicotine, and Norco. Mother admitted she began smoking marijuana at age 11 and used methamphetamine thereafter, including with father. Parents stole drugs and were drug runners. Father denied abusing substances, but admitted to smoking "dope"; father tested positive for marijuana in August and September 2014.

Parents denied engaging in domestic violence. Mother, however, stated that father "smacked" her in the face. Father did not recognize that this was violent. He also did not understand that he failed to protect the children.

Father lived in New York from March to December 2013; he sought placement of the children with him there. At the time, he was 56 years old and had 14 children. Nine of father's children were over the age of 18. Two of his children were ages seven and 11, and lived with their mother. Father did not finish high school, but he had worked in carpentry, brick laying, and the railroad and roofing industries. Most recently, father worked at an animal shelter through a welfare program. Parents were known to "squat" at properties and not pay rent. The Department placed the children in different foster homes, and looked for a single home that could take the three siblings.

Mother had a warrant for driving without a license. Although father admitted that he was arrested for possessing an unregistered handgun, his criminal record indicated multiple arrests for battery, lewd conduct with a child, statutory rape, contributing to the delinquency of a minor, and possession of marijuana for sale. Father's only conviction, however, was for possession of marijuana for sale.

On September 24 and November 19, 2014, the court sustained section 300 allegations regarding mother's mental health issues and substance abuse, father smoking marijuana and failing to protect the children, and parents engaging in domestic violence. The court removed the children from parents, found father to be the presumed father, ordered family reunification services for parents, maintained the children in foster care, and set the six-month review hearing for April 6, 2015.

The report for the April 6, 2015, six-month review hearing recommended termination of family reunification services. Father denied he needed substance abuse treatment, yet tested positive for marijuana and missed random tests in March 2015. Father attended weekly supervised visits, but seemed unable to give the children adequate attention and care. He attended therapy; more counseling was recommended.[2] Father investigated enrolling in substance abuse treatment in March 2015, but conveyed to the social worker that the program was too long "so [the Department] can all (expletive) off."

On April 6, 2015, parents failed to appear for the review hearing. Therefore, the court set a short cause trial for April 21, 2015. The Department's addendum report stated that father tested positive for marijuana and missed a random drug test in April 2015. Father also became more aggressive with the Department and the caregivers. Mother appeared under the influence at visits.

On April 21, 2015, parents attended the short cause trial. The court therefore set a long cause trial for May 8, 2015.

On May 8, 2015, parents attended the trial. Father's counsel provided evidence that father enrolled in a substance abuse treatment program and reportedly had a positive attitude toward recovery. After reviewing the evidence and listening to argument from mother's counsel and father's counsel, the court terminated family reunification services and set a section 366.26 hearing for September 8, 2015.

---

[2] The factual background focuses on father more than mother because of the different issues raised in their respective briefs.

In the section 366.26 report, the Department requested a 90-day continuance to allow the children to be transitioned to an adoptive home and for the Department to perform an adoption assessment. After services were terminated in May 2015, parents had transportation difficulties and attended only two visits, which were described as "mediocre." The Department reported, "there seems to be a disconnection between the children and parents." On September 8, 2015, the court continued the section 366.26 hearing to December 7, 2015.

On October 1, 2015, father filed a section 388 petition requesting return of the children to father, or family reunification services. The court summarily denied the petition, finding it lacked a prima facie case.

The Department filed an addendum section 366.26 report. In the report, the Department recommended termination of parental rights to permit the children to be adopted by Mr. and Mrs. D. The children were placed with the prospective adoptive parents on October 22, 2015, and adjusted quickly. This was their third placement. The two older children would approach the prospective adoptive parents to receive hugs, and enjoyed the attention they received at the home. When the prospective adoptive parents returned home, the children ran to them, yelling, "dad dad" and "mama." L.B. was very clingy and loved to be held. The prospective adoptive parents reported that the children fit right into their home and appeared to be happy. The prospective adoptive mother expressed, "They are great little kids and I love them all!" She also stated that "every kid should have a chance. With the right environment, they can blossom into special people. . . . God led us to have them in our home."

7

The prospective adoptive parents married in 2010. The prospective adoptive father was a police officer. Previously, he worked as a child counselor in a group home. The prospective adoptive mother was a court office assistant for the superior court. They stated they had a great family structure and good balance. They had no medical issues and no use of tobacco or drugs. They reported infrequent social use of alcohol. They intended to meet the social needs of the children through their large families, church and school.

For parents, the juvenile court ordered weekly supervised visits, two hours in duration. The prospective adoptive parents resided in Fresno, but the visits were to be held at an agency office in Riverside. Parents had trouble securing reliable transportation. From May to September, they attended only two visits. From September to November 2015 father attended visits more regularly than mother. Again, the quality of the visits was described as mediocre since there seemed to be a disconnect between parents and the children. Father also paid more attention to L.B. than to M.L. or J.B.

On December 7, 2015, parents attended the section 366.26 hearing; trial was set for January 6, 2016.

A Department addendum report indicated the children appeared bonded with the prospective adoptive parents. The children were healthy, well-mannered, and happy. The prospective adoptive parents took the children to medical appointments and connected with services, apparently to resolve language and motor-skill delays found in the children.

On January 6, 2016, at the section 366.26 trial, the court admitted the Department reports into evidence, parents testified, the court listened to argument, and then rendered a judgment.

Mother testified that she disagreed with the termination of her parental rights. She attended supervised visits, but missed visits due to transportation issues. The children called her "mommy" and did not want the visits to end. J.B. and M.L. told her they loved her. L.B. gave her kisses.

Father testified that M.L. and J.B. lived with him until three weeks before they were removed from mother, but L.B. never lived with him. He attended each visit until the children were moved. When visits were in Riverside, they conflicted with his classes. He did not visit the children in Fresno as he was unfamiliar with that city. The children called him "daddy," and were excited to see him. He brought them food, played with them, and changed diapers for M.L. and L.B. He guessed that the children did not like leaving the visits because they tried to get him to take them home. He was religious and did not use drugs.

Counsel for mother and father each argued that their clients had beneficial relationships with the children, an exception to adoption. The children's counsel argued that the parent/child bond did not apply. The children were young, adoptable and doing extremely well in their placement. The Department's counsel concurred with the children's counsel.

The juvenile court found that the children were adoptable. They adjusted to their new placement and were bonded with their prospective adoptive parents. From October

2015 to January 6, 2016, parents missed visits, but that was excusable since the children lived far away. However the court noted that before the children moved to Fresno, from May to September 2015, parents only attended two visits, and the quality of the visits was mediocre. The court also noted that father became aggressive and exhibited negative behavior at visits, and mother may have been "under the influence." Visits were sporadic and always supervised. Parents failed to prove that they had beneficial relationships constituting exceptions to adoption. Hence, the court terminated parental rights. The court also advised parents of their appeal rights.

B.    ICWA NOTICING BACKGROUND

On August 18, 2014, the Department initiated the dependency for L.B. On September 2, 2014, the Department initiated dependencies for J.B. and M.L. The Indian Child Inquiry Attachments (ICWA-010) filed with the section 300 petitions indicated that the children had no known Indian ancestry.

On August 19, 2014, at L.B.'s detention hearing, parents filed Parental Notification of Indian Status forms (ICWA-020) indicating that neither parent had Indian ancestry. In oral statements, mother confirmed that she had no Indian ancestry. Father, however, stated that his grandmother was Cherokee. He provided his grandmother's name but did not know her date of birth. The court set L.B.'s jurisdictional and dispositional hearing for September 9, 2014. At the detention hearing for J.B. and M.L., mother was present but not father. Mother filed an ICWA-020 indicating she had no Indian ancestry. She orally advised the court that neither she nor father had Indian ancestry.

10

The jurisdictional and dispositional report for L.B. stated, "mother indicated she may be affiliated with the Blackfoot or Cherokee tribes. The father . . . indicated he may have Native American heritage." However, father had stated previously that his grandmother was Cherokee. The jurisdictional and dispositional report for J.B. and M.L. stated mother told the court that she had no Indian heritage, and father stated that "there may be Indian Heritage."

On August 20, 2014, for L.B.'s case, the ICWA clerk mailed the Notice of Child Custody Proceeding for Indian Child forms (ICWA-030) by certified mail, noticing the three federally recognized Cherokee tribes and single federally recognized Blackfeet Tribe, the BIA, Secretary of the Interior, and parents, regarding the hearing set for September 9, 2014. On September 4, 2014, the Department filed a report for the court's inspection in L.B.'s case reflecting ICWA notice. The ICWA-030s identified L.B. and parents with first and last names, and included mother's maiden name, respective dates of birth, current and former addresses. The forms stated the Cherokee and Blackfeet heritage stemmed from father's relatives. For mother, no tribe was stated but the BIA was listed, suggesting mother's possible Indian heritage.

As relating to L.B., paternal and maternal grandmothers were stated on the ICWA-030, along with their maiden names, current and former addresses, birthdates and locations of birth. For the paternal grandmother, her date of death and the state where she died were indicated. She reportedly had Blackfeet heritage. "No information available" was stated for the maternal grandfather, but substantial information was provided for the paternal grandfather, who was deceased, but had Cherokee heritage. Two maternal great-

11

grandmothers and paternal great-grandmothers were also stated. As to the paternal great-grandmothers, the forms indicated that they were deceased, one in the "1900s; New York," the other in Maryland. The one from New York had Blackfeet heritage. The one from Maryland, the one who father had named in court, had Cherokee heritage. Two paternal great-grandfathers were also stated. One of them had Cherokee heritage and died in Maryland in the 1960s. The other paternal great-grandfather had Blackfeet heritage and died in New York in the 1980s.

The ICWA-030 forms were substantially complete as to L.B. When the Department did not have the requested information, it stated, "No information available." Correspondence from the Cherokee Nation and United Keetoowah and of Cherokee Indians stated L.B. was not considered an "Indian child" in those tribes.

On September 22, 2014, the Department filed a report for the court's inspection in L.B.'s case, indicating that no tribe confirmed membership or eligibility for membership in the tribe. Correspondence from the Cherokee Tribe of North Carolina and Blackfeet Tribe indicated that L.B. was not an Indian child.

On September 24, 2014, the court sustained part of the petition allegations for the three siblings, and set the six-month review hearing for April 6, 2015.

On October 14, 2014, the ICWA clerk mailed the ICWA-030s on behalf of J.B. and M.L. to the BIA, Secretary of the Interior, and parents, noticing them for the six-month review hearing scheduled for April 6, 2015. On October 16, 2014, the Department filed a report allowing the court to inspect the ICWA noticing documents. The ICWA-030s were substantially complete, as with the ICWA-030 for L.B.'s case, but the BIA

12

was stated as parents' tribe of heritage, and the form omitted the Blackfeet and Cherokee tribes concerning father's heritage. No notice was sent to either of the two tribes.

On November 17, 2014, the Department filed another report for court inspection reflecting ICWA noticing provided in the cases for J.B. and M.L.

On November 19, 2014, the court sustained the balance of the allegations for the siblings, addressed disposition issues, and confirmed the review hearing. At the November 19, 2014, hearing, by adopting the findings in the jurisdictional and disposition report, the court found that ICWA may apply and ICWA noticing requirements were initiated. However, on November 6, 2014, a report by the ICWA clerk was filed indicating no affirmative response of tribal membership was received, hence, ICWA did not apply. On November 6, the court signed a proposed order finding that ICWA did not apply. The attorneys all received the report and proposed order/finding; they posed no objections.

On January 8, 2015, the Department filed an ICWA report. The Department advised that 65 days had passed since the BIA and Secretary of the Interior had been notified of J.B.'s and M.L.'s proceedings. The report summarized the notice sent and received. Attached correspondence from the BIA indicated that the BIA does not determine tribe eligibility. On January 8, 2015, the juvenile court signed a proposed order, which had been presented with the report, finding that ICWA did not apply. The parties did not object.

13

On May 8, 2015, at the consolidated six-month review hearing, the trial court terminated services, set the section 366.26 hearing, and provided parents with writ rights. No party raised any ICWA issues. No writs were filed.

On January 6, 2016, the court held a consolidated section 366.26 trial. The court terminated parental rights and provided parents with their appellate rights. No ICWA issues were raised.

On February 2, 2016, parents filed their notices of appeal.

## DISCUSSION

A.     THE ICWA NOTICE WAS INADEQUATE

Mother contends that both sets of ICWA notices failed to identify mother's tribal affiliation with the Cherokee and Blackfeet tribes. Therefore, mother asserts lack of compliance with ICWA inquiry and noticing requirements mandates reversal.

"Congress enacted ICWA to further the federal policy '"that, where possible, an Indian child should remain in the Indian community . . . ."'" (*In re W.B.* (2012) 55 Cal.4th 30, 48.) "When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. [Citation.] First, if the court knows or has reason to know that an '"Indian child"' is involved in a '"child custody proceeding,"' . . . the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. . . . [¶] Next, after notice has been given, the child's tribe has 'a right to intervene at any point in the proceeding.' . . . [¶] Finally, an enforcement provision offers recourse if an Indian child has been removed from

14

parental custody in violation of ICWA." (*Id.* at pp. 48-49.) "Thorough compliance with ICWA is required." (*In re J.M.* (2012) 206 Cal.App.4th 375, 381.)

Of concern here is the notice requirement. If an agency "knows or has reason to know that an Indian child is involved" in a dependency proceeding, the agency must send notice of the proceeding to, among others, a representative of all potentially interested Indian tribes. (§ 224.2, subd. (a).) "[F]ederal and state law require that the notice sent to the potentially concerned tribes include 'available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data.' [Citations.] To fulfill its responsibility, the Agency has an affirmative and continuing duty to inquire about, and if possible obtain, this information. [Citations.] Thus, a social worker who knows or has reason to know the child is Indian 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2 . . . .' [Citation.] That information '*shall* include' '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known.' [Citation.] Because of their critical importance, ICWA's notice requirements are strictly construed." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396-1397.)

In this case, mother claims that the Department failed to comply with ICWA because the notices failed to properly identify the tribes of heritage for each parent. In its response, the Department agrees with mother.

Here, as summarized in detail *ante*, as to L.B., the Department sent ICWA notices to Blackfeet and Cherokee tribes relating to father's claim of Indian ancestry. However, no ICWA notices were sent to any Indian tribes regarding mother's alleged Indian ancestry. As to M.L. and J.B., there was no reference to any tribe and no notice was sent to any tribe. Although mother initially claimed that neither parent had any Indian ancestry, the Department was fully aware that father had claimed Indian heritage in L.B.'s case. Moreover, the jurisdictional and disposition report for M.L. and J.B. noted that although mother denied Indian heritage, father indicated that he may have Indian heritage. ICWA notices were only sent to the BIA and Secretary of the Interior, which is insufficient notice when a federally recognized tribe of heritage has been named by either parent. (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1202.)

Therefore, based on the above, the trial court's findings that proper notice was given under the ICWA, and/or whether ICWA applies are not supported by substantial evidence. A limited reversal and remand to clarify and cure any ICWA noticing defects is warranted.

B.     THE PARENTAL BENEFIT EXCEPTION DID NOT APPLY

Father claims that the juvenile court erred when it terminated his parental rights because the parental benefit exception applied.[3]

In general, at a section 366.26 hearing, if the juvenile court finds that a child is adoptable it must terminate parental rights.  (§ 366.26, subds. (b)(1) & (c)(1).)  This rule, however, is subject to a number of statutory exceptions (§ 366.26, subds. (c)(1)(A) & (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

"'[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*In re Jason J.* (2009) 175 Cal.App.4th

---

[3] Mother joins in father's argument.

922, 938.)  The parent must show more than frequent and loving contact or pleasant visits.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)  "'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.'"  (*Jason J.*, at p. 937.)

"The parent contesting the termination of parental rights bears the burden of showing both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship."  (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.)  This court must affirm a juvenile court's rejection of these exceptions if the ruling is supported by substantial evidence.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)  We review "the evidence most favorabl[e] to the prevailing party and indulg[e] in all legitimate and reasonable inferences to uphold the court's ruling."  (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)  Because Mother had the burden of proof, we must affirm unless there was "indisputable evidence [in her favor, which] no reasonable trier of fact could have rejected."  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)

In this case, father failed to meet the first requirement of the exception—that he regularly visited the children.  (§ 366.26, subd. (c)(1)(A).)  Here, father had some transportation issues that occasionally interfered with his ability to visit the children.  The court did not consider missed visits (when the children's change in placement was to a

remote location) when the court determined that father's visits were sporadic. The court noted, "[l]et me begin by staying I know the children were placed in Fresno in October so I am not going to deal with the lack of visitation from October 22nd to the present day because I understand the hardship on [parents], so I want to make it clear to all the parties that is not factoring into the Court's decision." Although father testified that he visited regularly with the children, the court went on to comment on the sporadic visits father had with the children during the pendency of this dependency. We note that it is the trial court's role to assess the credibility of witnesses and to weigh the evidence to resolve conflicts in the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) Here, based on the evidence presented and weighing the credibility of the witnesses, the court determined that father did not regularly visit the children.

Even if father visited regularly and consistently, the beneficial parental relationship exception requires *both* regular visitation *and* benefit to the child. Here, father has failed to establish benefit to the children.

The second requirement for the parental benefit exception to apply requires that father prove that the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(A).) "The existence of this relationship is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.'" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567.)

19

In this case, at the time of the contested section 366.26 hearing, the children were ages one and one-half, two and one-half, and four years old. When they were initially removed, M.L. and J.B. were ages one and two and one-half years old, respectively. L.B. was detained at birth and never resided with father. She spent her entire life either in the custody of the Department or under its supervision. The other two siblings spent only a year or two out of the Department custody. Accordingly, the majority of the children's lives were spent out of father's custody.

Although father characterizes parents as the "only constant parental figures" for the children, the record shows otherwise. As noted *ante*, L.B. was detained at birth. She had spent 16 months in foster care by the time of the section 366.26 hearing. Father did not visit L.B. at the hospital in the two weeks after her birth, and father never had custody of L.B. As for the other children: M.L. spent approximately 14 months in parental custody, and 16 months out of parental custody; and J.B. spent approximately two and one-half years in parental custody, and 16 months out of parental custody, when the section 366.26 hearing was held. Father, however, was not the primary caregiver for M.L. and J.B.; the primary caregiver was mother. Father resided on the east coast for several months. Moreover, parents did not have a stable relationship; as examples, father doubted his paternity as to L.B., mother engaged in a voluntary family maintenance plan alone before the dependency commenced, parents had split up for some time due to domestic violence, and father resided out of state for a period of time and frequently traveled out of state. Moreover, parental visits were descried as "mediocre," since there was an apparent disconnect between parents and the children.

Furthermore, the children needed a permanent and stable placement—which is the required focus of the section 366.26 hearing. Here, the children have already suffered instability. They were initially split up for some time, and resided in three foster care placements. When parents had custody of the children, they did not have stable housing. Instead, they squatted at various properties. The children's prospective adoptive parents not only provide them with stability in housing, they also provide the children with stability in their daily lives. The prospective adoptive parents take the children to medical appointments and connect the children with services to resolve developmental delays. The children are bonded with the prospective adoptive parents and express affection. The children hug the prospective adoptive parents, call them "dad dad" and "mama," and love to be held by them. Moreover, the children need "a home environment free from the negative effects of substance abuse," which is recognized as "a necessary condition for the safety, protection and physical and emotional well-being" of children. (§ 300.2.)

Mother admitted she began smoking marijuana at age 11, and used methamphetamine thereafter, including with father. Mother and father stole drugs and were drug runners. Father denied abusing substances but admitted to "smoking dope," and tested positive for marijuana in this case. Parents also denied engaging in domestic violence, yet, mother stated that father "smacked" her in the face. Father did not see this act as being violent. Dissimilar to parents, the prospective adoptive parents do not live substance-abusing lifestyles, do not use tobacco or drugs, and consume alcohol rarely on

21

social occasions. They intend to meet the children's social needs through their families, church and school events.

Based on the above, we find there is substantial evidence to support the juvenile court's finding that father failed to meet his burden of proof to establish the beneficial parental relationship exception applied in his case.

Father's reliance on *In re Amber M.* (2002) 103 Cal.App.4th 681, is misplaced. In *Amber M.*, the appellate court held the lower court erred in finding that an exception to adoption did not apply where the mother maintained regular visits with the children, and the psychologist, therapists, and court-appointed special advocate unanimously stated that mother had demonstrated the existence of mother's beneficial parental relationship, which outweighed the benefits of adoption. (*Id.* at pp. 689-691.) In this case, there are no such facts or evidence to support father's beneficial parental relationship with the children. As noted in detail *ante*, father failed to meet the threshold requirement of demonstrating regular visitation with the children.

Father's reliance on *In re S.B.*, *supra*, 164 Cal.App.4th 289 is also misplaced. In that case, the father "complied with every aspect of his case plan," and maintained his sobriety and consistently visited with his child. (*Id.* at p. 293.) The father's physical and emotional health problems, however, prevented him from reunifying with his child. Although the child was placed with her grandmother, who wanted to adopt her, a bonding study showed that the child had a "moderate" and "fairly strong" bond with her father. The agency recommended termination of parental rights, but hoped that the grandmother would allow the father to visit. The juvenile court found that there was no evidence that

22

it would be greatly detrimental to terminate the child's relationship with the father and terminated parental rights.  (*Id.* at p. 296.)  The father appealed and the appellate court agreed with the father finding that the child had a "substantial, positive emotional attachment" with the father.  (*Id.* at pp. 293, 301.)

This case is distinguishable.  Here, father had no medical issues preventing him from reunifying with the children.  Moreover, unlike the father in *In re S.B.*, father resisted reform as he continued to engage in substance abuse and minimized his role in the removal of the children.  Although he viewed his visits with the children as positive, the Department reported to the contrary.  Father was not parental with the children, he did not adequately tend to them during supervised visits, and continued to bring unhealthy food to the visits even after he had been asked not to bring such items.

In sum, father has the burden to establish the applicability of the beneficial parental relationship exception in the lower court; on appeal, he has the burden of showing that the juvenile court's ruling was an abuse of discretion.  We conclude that father has failed to meet this burden.

## DISPOSITION

The juvenile court's finding that ICWA is not applicable is vacated.  The case is remanded to the juvenile court with directions to ensure the Department has complied with the notice requirements of ICWA.  If, after new notices, any of the Cherokee or Blackfeet tribes claim the children are eligible for membership and seek to intervene, the juvenile court shall proceed in conformity with all the provisions of ICWA.  If, on the other hand, none of the tribes make such claims following new notices, or the court

23

concludes the Department's efforts at compliance were adequate, the inapplicability finding and the order terminating parents' parental rights and adopting a permanent plan as to the children shall be reinstated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

                                            J.

We concur:

McKINSTER _____
                 Acting P. J.

CODRINGTON _____
                 J.